Alvin S. BODIE, Plaintiff–Appellant,

v.

The CITY OF COLUMBIA, SOUTH CAROLINA, Defendant–Appellee,

Secretary of Labor, Amicus Curiae.

No. 89–3229.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 2, 1990.

Decided June 4, 1991.

As Amended June 21, 1991.

Thomas Aquinas Woodley, Mulholland & Hickey, argued, Washington, D.C. (Gregory K. McGillivary, Mulholland & Hickey, on

the brief, Washington, D.C.), for plaintiff-appellant.

Julian Heyward Gignilliat, Gignillait, Savitz & Bettis, argued, Columbia, S.C. (Linda Pearce Edwards, Vance J. Bettis, Gignilliat, Savitz & Bettis, on the brief, Columbia, S.C.), for defendant-appellee.

Jerry G. Thorn, Acting Sol. of Labor, Monica Gallagher, Associate Sol., Linda Jan S. Pack, counsel for appellate litigation.

Leif G. Jorgenson, U.S. Dept. of Labor, Washington, D.C., for amicus curiae.

Before ERVIN, Chief Judge,
DONALD RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE, WILKINSON, WILKINS, and NIEMEYER, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

While styled as one for a declaratory judgment, this suit is actually a simple action under the Fair Labor Standards Act ("Act"), 29 U.S.C. §§ 201 et seq., to recover overtime pay for "sleep time" by a municipal government firefighter. The defendant municipality, City of Columbia, South Carolina ("City"), defended on the ground that under special sections of the Act and regulations thereunder, "sleep time" of firefighters such as the plaintiff, operating under a work schedule meeting the formula set forth in 29 C.F.R. § 553.222(c), was excluded in calculating work time for overtime pay, provided the firefighter agreed directly or impliedly to such exclusion. The plaintiff firefighter in this case, Alvin S. Bodie, denied he had so agreed and therefore seeks overtime pay for such sleep time. The district judge found that the plaintiff firefighter had by his action and conduct implied agreement to the exclusion and dismissed the action. We affirm.[1]

I.

Originally, the Fair Labor Standards Act exempted from its coverage employees of States, state agencies, and public municipalities. Gradually, however, Congress chipped away at this broad exemption by making the Act applicable to select groups of state and municipal employees. Finally, in 1974, the Act was extended to cover all employees of the States and state subdivision agencies, subject to some very discrete classes of such employees for whom unique conditional exemptions were granted. Among those discrete classes partially exempted were employees engaged in fire protection activities. 29 U.S.C. § 207(k). In providing this partial exemption for firefighters, Congress introduced the term "tour of duty," which "is a unique concept applicable only to employees for whom the section 7(k) exemption is claimed," and which "means the period of time during which an employee is considered to be on duty for purposes of determining compensable hours." 29 C.F.R. § 553.220(a).[2] Later, in 29 C.F.R. § 553.222(c), it was provided that "sleep time" of a firefighter could be excluded from his "tour of duty" as work time, provided he is on a tour of duty of more than 24 hours, and "if there is an expressed or implied agreement between the employer and the employees to exclude such time."

In 1976, the Supreme Court held that the Commerce Clause would not sustain the application of the Act to State or state subdivision employees. *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). For some time after *Usery*, States and their subdivisions considered themselves immune from the requirements of the Act. However, in 1985, the Supreme Court reversed *Usery* and reinstated the Congressional extension

---

1. This was one of three cases involving a right to compensation for sleep time on the part of public firefighters. Each case was somewhat different from the others and had been heard and disposed of in separate opinions. All of the cases were appealed, and we consolidated the appeals for one *en banc* hearing. However, the actual decision in each case required a separate opinion based on the unique facts of each case.

2. The statute authorized the Secretary to issue regulations governing its enforcement of the application of the exemption.

of the Act to State employees,[3] returning to largely the procedure used after the enactment of the 1974 Amendments and prior to the decision in *Usery*. States and local public agencies at that point generally adjusted their work schedules or "tours of duty" for firefighting employees to meet the requirements for the partial exemption given by 29 U.S.C. § 207(k) for such employees. Thus, on June 10, 1985, the defendant City of Columbia changed the work schedule of its firefighters from tours of duty of 24 hours followed by two days off, to tours of duty of 24 hours and 15 minutes followed by two days off.

In October 1985, some four months after the City had changed the work schedule for its firefighters and after the City's firefighters had been working and receiving compensation under the revised work schedule, thirty-six of the City's firefighters wrote identical letters to the City Manager stating that they did not "consent" to the revision and particularly that they did not consent to the exclusion of their sleep time as noncompensable hours of work. The City responded by restating its intention to follow the new work schedule and enclosed written letters of "Agreement of Consent" to the new work schedule and to the exclusion of their sleep time as compensable work time. The City's response added that, if the Agreement was not signed and returned by a fixed time, the protesting employee would be terminated. All the protestors signed the agreement and continued to work for the City.

The plaintiff Bodie was out of town when the protestors sent their letters protesting the new work schedule and the denial of sleep time as work time. He claimed he would have protested had he been present when the others mailed their written protest. However, he did not join in the protest, nor did he protest until after his retirement, when he filed this suit.

## II.

The single issue posed by this suit is whether the City properly excluded "sleep time" from the compensable hours of work of its firefighters such as the plaintiff. It is undisputed that the City of Columbia had the right to exclude "sleep time" from the plaintiff's compensable work time under the Act, but only if (1) the employee firefighter had been on a tour of duty of "more than 24 hours" and (2) the employee had agreed directly or impliedly to the "sleep time" exclusion. There seems to be no dispute that the first condition had been complied with by the City. The controversy, therefore, relates entirely to the second condition for the exclusion, *i.e.*, whether the plaintiff had either expressly or impliedly agreed to the exclusion. The City urges that the plaintiff's voluntary acquiescence in the new schedule, with its exclusion of sleep time from his compensable work period, for almost two years without the slightest protest, constituted an implied agreement to the exclusion of sleep time as compensable work time. The district court agreed with the City and found that the plaintiff had impliedly agreed to the exclusion of sleep time.

## III.

We agree with the district court. We are of the firm opinion that the plaintiff here impliedly agreed to the work schedule promulgated by the City on June 10, 1985, and was accordingly not entitled to recover for "sleep time" as compensable work time in any work period subsequent to that date. The district court cited precedents, stretching back over almost half a century, all involving claims to overtime pay under the Act, clearly sustaining the result reached by it. We find those authorities apposite. In the latest of these cases sustaining the district court's decision, the plaintiffs-employees were employed on derrick barges operating in offshore oil operations. *Rousseau v. Teledyne Movible Offshore, Inc.*, 805 F.2d 1245 (5th Cir.1986), *cert. denied*, 484 U.S. 827, 108 S.Ct. 95, 98 L.Ed.2d 56 (1987). In the oil boom of the 1970s, the

---

**3.** *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985).

derrick barges spent most of their time offshore on various jobs. In the periods between jobs when they were not on "active labor," the employees were required to remain aboard the barges but were paid only for the time spent in active labor. When conditions in offshore drilling became depressed, the barges spent more time on dock, but "even when the barges were docked, the employees were required to remain on board the barges during their off-duty time" without any compensation. *Id.* at 1247. The employees protested being uncompensated for this off-work time during which they were required to remain on the barge on dock.[4] The Court found that, whether this "off-work" time on dock when the employees were required to remain on the barges was to be compensable work time under the Act was a matter requiring agreement thereto on the part of the plaintiff. It held that the evidence established an implied agreement, saying:

> The record supports the district court's finding of an agreement between Teledyne and the employees. Representatives of Teledyne testified to informing the employees of the policy at various times. Indeed, many of the employees who testified admitted at least some awareness of the policy. Of course, it is clear that the employees did not like the no leave rule. But their dislike does not negate the existence of an agreement. As the district

court pointed out, continuance of employment can be evidence of an implied agreement to the terms of that employment. *Shepler v. Crucible Fuel Co.*, 140 F.2d 371, 374 (3rd Cir.1949 [sic]).

*Id.* at 1248.

*Rousseau* cited the same case which the district court here relied on, *Shepler v. Crucible Fuel Co.*, 140 F.2d 371 (3d Cir. 1944). In that case, the employer's work schedule for its employees would have increased considerably their overtime pay. The employer revised its work schedule and pay so that, even with the Act, the pay of the employee "when calculated with the normal overtime would not yield more than the amount they [the employees] had been receiving on the weekly basis." *Id.* at 373. The question was, as here, whether the change had been agreed to by the employees. The Court, relying on *Williams v. Jacksonville Terminal Co.*, 315 U.S. 386, 62 S.Ct. 659, 86 L.Ed. 914 (1942),[5] said that, "continuance in an employment under a new method of computing pay creates a new contract and that the employee's consent to the new arrangement may be found from the continuance, notwithstanding repeated protests on his part." 140 F.2d at 374.

The Court also held flatly that continuance in the job and acceptance under the new plan of payment was sufficient to cre-

---

**4.** They had also protested the policy of no-compensation duty for periods when the barge is at sea, but this claim was dismissed on a motion for summary judgment and was not seriously argued at trial. However, the Court of Appeals declared: "Our agreement with the district court's analysis of the compensability issue extends to all time spent on the barges, whether offshore or docked." *Id.* at 1247 n. 1.

**5.** *Williams* involved the red caps at the Jacksonville, Florida, railroad terminal. Prior to the enactment of the Fair Labor Standards Act, the red caps received the tips earned and were paid nothing by the Terminal. After the passage of the Act, the Terminal was required to pay a minimum wage to these employees. To meet this obligation, the Terminal established a method of compensation under which the tips received would be treated as wages and credited against the minimum wage with the employers making up the difference between the tips received and the minimum wage. The red caps

protested and demanded that the tips should not be treated as partial wages and credited against their minimum wage. The Supreme Court sustained the employer in its right to change the method of compensating the red caps in order to comply with the Act and found unavailing the red caps' protests because they had, with knowledge of the new method, continued to work and receive their compensation under the new plan. The Court said:

> Although continuously protesting the authority of the railroads to take over the tips, the redcaps remained at work subject to the requirement. Such protests were unavailing against the employers. Although the new plan was not satisfactory to the redcaps, the notice transferred to the railroads' credit so much of the tips as it affected. By continuing to work, a new contract was created.

315 U.S. at 398, 62 S.Ct. at 667.

ate a valid agreement, even though the agreement was implied and not in writing.[6]

*Ariens v. Olin Mathieson Chemical Corp.*, 382 F.2d 192 (6th Cir.1967), is to the same effect. It involved firefighter guards engaged at work under a contract with the United States Army. The claim litigated was the right of the firefighter guards to "overtime pay for the entire sleep periods since 1959, and for liquidated damages." In 1959, the employer had instituted a "three-platoon" work schedule under which the firefighter guards "were not compensated for the sleep periods, except that they received overtime pay for the occasional call-out intervals which interrupted the periods." *Id.* at 194. When they had begun work, they were issued a pamphlet describing the three-platoon system of work and compensation. The Court found:

Although only one of the plaintiffs testified that the work and compensation schedules were fully explained to him before he commenced work, all the men admitted they "found out" about the schedule on the first day of work. They, of course, realized they were not being compensated for the sleep periods when they received their first paycheck. Work schedules were posted. Some of the plaintiffs complained to the chief of the unit about the lack of compensation for the sleep periods but no paychecks were refused.

*Id.* at 194.

The Court ruled that, under these facts, there was an implied agreement of the employees "to exclude sleeping time from hours worked" by the firefighter guards;

As to [this agreement], we are of the opinion there was a meeting of minds resulting in a valid agreement that plaintiffs would not be paid for sleeping time.

The work schedule was explained in the pamphlet [sic] given to each man before he commenced work. The men "found out" about their work schedule on their first day of duty. The work schedules were posted and plaintiffs continued throughout the time in question to accept paychecks which excluded sleeping time from hours worked. Certainly, this was sufficient to constitute an implied agreement between the parties within the meaning of the interpretative bulletin. *Id.* at 197.

The plaintiff disingenuously would find this case inapposite, because the union representing the employees in the *Mathieson* case had on September 14, 1964, agreed with the employer on the treatment of sleep time as noncompensable. But what the plaintiff overlooks is that the claim was not for sleep time subsequent to September 14, 1964, the effective date of the union contract, but for the entire period from October 1959 to September 14, 1964.

*Beebe v. United States*, 640 F.2d 1283, 1289 n. 3, 226 Ct.Cl. 308 (1981), makes the same error. It declares that in *Mathieson* "the court expressly found that during the period for which overtime was claimed, the employer and the union representing the firefighters had entered into an agreement which stated that the time designated as sleep time would not be considered as hours worked and would not be compensable." The Court also overlooked the fact that *Mathieson* was decided on the basis of an implied contract and not on the agreement with the union, and that in so doing it cited and relied on *Williams v. Jacksonville Terminal Co.*, *supra*, and *General Electric Co. v. Porter*, 208 F.2d 805 (9th Cir.1953), *cert. denied*, 347 U.S. 951, 74 S.Ct. 676, 98 L.Ed. 1097 (1954), both of

**6.** The principle in *Rousseau* that "continuance of employment can be evidence of an implied agreement to the terms of that employment" was assailed by a party in a later Fifth Circuit case, but the Court emphatically refused to depart from the principle. *Brock v. El Paso Natural Gas Co.*, 826 F.2d 369, 374 (5th Cir.1987).

Amicus in its brief would distinguish *Rousseau*, because there the employees "could and did protest the schedule without being fired." In making this statement, amicus overlooks the

fact that the Court cited with approval and followed the decision in *Shepler*, where, as we have seen, the Court, relying on similar language in the Supreme Court decision in *Williams v. Jacksonville Terminal Co.*, found an implied agreement "notwithstanding reported protests" by the parties. Moreover, as we later point out, the plaintiff here did not protest and did not object. He accepted the change voluntarily with full knowledge of the facts.

which were decided on the basis of an implied contract formed by the acceptance of pay under the work schedule providing for an exemption for certain restrictions on compensable work time known to the employees. *See Mathieson*, 382 F.2d at 197, as quoted above.

*General Electric Co. v. Porter* also sustained a finding of an implied agreement from the continued work and receipt of pay under a new work schedule. This case involved the firemen in a group of defense plants being operated under contract by General Electric. General Electric, "without consultation or agreement with the firemen," had, "as an economy measure, unilaterally initiated a change" from a formerly "fixed hourly wage for a forty-hour week with time and one-half for overtime" to "the so-called two-platoon system" as a result of which the firemen no longer earned overtime. The firemen "knew well in advance that the change-over was to take place" and they "raised objections both prior to and subsequent to the change." Their request for a conference with the employer "was refused." However, the firemen "continued to work under the new conditions. They attempt[ed] to justify their action in this regard on the ground that jobs were scarce and they were reluctant to employ the economic weapon of a strike in a plant engaged in the production of the vitally needed plutonium." The firemen argued "that the trial court should have based its computation of overtime upon the hourly rate at which they had been employed" prior to the initiation of the two-platoon system. 208 F.2d at 811–12. The Court dismissed the objec-

tions of the firemen to the change to the two-platoon system, saying:

> The firemen, no matter what may have motivated them in remaining at work, cannot now be heard to say that they did not acquiesce in the new arrangement. We hold that as a matter of law the unilateral action of the employer was impliedly accepted by the firemen and that a new contract was created whereby the employees agreed to work on a two-platoon system at a fixed monthly wage.[7]

*Id.* at 813.

## IV.

We find that these precedents, spread over a period of half a century from at least six circuit courts of appeals, amply support the conclusion reached by the district court in this case. The plaintiff, however, has cited a number of cases which he argues sustain his position. We find none of them analogous to this case. The one on which the plaintiff principally relies, and the one cited in all the other decisions said to sustain his position, is *Beebe v. United States, supra*. In that case, the Department of Agriculture, under the authorization of the Civil Service Commission, had changed its work schedule for firefighters under its control to conform with what it conceived to be allowed under Section 207(k). Under this new schedule to be effective on and after January 1, 1975, the firefighters were required to "remain on duty in excess of the number of hours which entitle[d] them to overtime compensation under 29 U.S.C. Sec. 207(k)(1), unless the defendant was legally authorized to

---

7. There was a collateral issue relating specifically to sleep time. There admittedly had been "no agreement or understanding between the firemen and General Electric with regard to compensation for sleeping time"; in fact, "[t]he change to the two-platoon system was made *without discussion as to whether or not time spent sleeping was to be compensated." Id.* at 814–15 (emphasis added). The Court found also that "payment of the monthly wage without indicating that the compensation was for only sixteen of the twenty-four hours spent at the fire station indicates a belief on the part of General Electric that it employed the firemen for the full twenty-four hour shift. The action of the firemen in protesting the change-over and the com-

mencement of this action is evidence of a belief on their part that sleeping time was time worked for which they were entitled to be compensated." *Id.* at 815. This is entirely different from the case under review where "sleep time" was the sole issue under discussion. That issue was clearly spelled out by the City Manager in his letter inaugurating the new pay schedule and the employees, including the plaintiff, clearly understood this. The protests registered by the employees who did object to the exclusion of sleep time as work time show conclusively by the wording of their letter that they understood the issue and that it was this issue they were protesting.

deduct eating and sleeping time in computing their overtime pay." 640 F.2d at 1287. As soon as the firefighters heard of this change, they objected, and their union representation filed on their behalf in March 1975, "an informal grievance." Receiving no reply to the informal complaint, the union representative in February 1976 filed a formal grievance with the agency. In July 1976, the agency advised the union that the grievance could not be accepted "because the Civil Service Commission had established an appeals procedure." The union and the employer then sought to deal with the issue in connection with their contract negotiations. The parties reached an impasse in the negotiations. At that point, the sleep time claim was submitted to the Civil Service Commission and then followed with this suit for a declaration of rights. *Id.* at 1288. Obviously, the plaintiffs had contested from the outset their objection to the treatment of sleep time as noncompensatory work time and they sought in all possible avenues, administrative and judicial, to resolve the issue. Under such circumstances, the Court held that agreement to the exclusion was not to be implied from the acceptance of pay during the time the right of the employer to assert the exemption was under the process of determination. That situation is no way analogous to the one here in which the plaintiff-employee made no protest—in fact, he sought to lead the City to believe that it was acceptable to him to exclude sleep time as compensable work time.

The other cases relied on by the plaintiff, all of them district court cases as distinguished from all those relied on by the lower court, which were Courts of Appeals decisions, manifestly are not similar to this case. In *Intern. Ass'n of Firefighters v. Rome, GA,* 682 F.Supp. 522 (N.D.Ga.1988), a suit by municipal firefighters objecting to the sleep time exemption, the Court's rationale for its decision not to find an implied agreement to the exclusion based on continued work and acceptance of pay with a deduction for sleep time was as follows:

> The Court holds that under § 553.222, an implied agreement to exclude sleep time may not be inferred from a continu-

ation in working and accepting pay checks where there exists contemporaneous protest to the employer's institution of a policy to exclude sleep time. There is no need to search for implications of mutual consent when there is clear contemporaneous expression of dissent. *All firefighters who expressed disagreement with the changes cannot be held to have agreed, despite their continuation in working and accepting pay.*

*Id.* at 529 (emphasis added). The plaintiff in this case, unlike the plaintiff in that case, did not protest the exclusion of his sleep time from his compensable work time; indeed, admittedly by his own actions, he sought to induce the City to assume and believe that he acquiesced in the exclusion.

In *Local 2962, IAFF v. City of Jacksonville [N.C.],* 685 F.Supp. 513 (E.D.N.C. 1987), another firefighter case in which the issue was whether the employees had impliedly or expressly agreed to the exclusion of sleep time from compensable work time, the Court refused to find that there was an implied acquiescence in and agreement to the exclusion. It based this decision precisely on the fact that the employees had protested. This fact, the court concluded, conclusively established that the employees had not agreed to the exclusion. This is manifest in the Court's ruling:

> Although defendant argues that an agreement can be implied because of plaintiff's "continued employment" or their failure to file "comments" at the time the policy was adopted, the court disagrees. It is undisputed that plaintiffs filed a petition with defendant's manager objecting to defendant's new sleep time policy within days of its posting. In light of *Beebe, supra,* this action is sufficient to negate any implication that plaintiffs consented to the policy simply because they continued to work.

*Id.* at 519–20.

*Brewer v. City of Waukesha, Wis.,* 691 F.Supp. 160 (E.D.Wis.1988), is equally inapposite. In that case, there had been an arbitration, after an impasse had been reached in negotiations, followed by the

acceptance of the arbitration decision by the employees' collective bargaining agent. That decision exempted sleep time from compensable work time. It was argued that this action of the collective bargaining agent and the impasse procedure bound the individual employees to the exemption of sleep time under the Act. The Court held that the employees were not bound, since Section 207(k) requires that "the individual firefighters ... expressly or impliedly agree." *Id.* at 163. The case here involves no like argument nor are its facts susceptible of such argument.

## V.

In summary, we conclude that the district court properly concluded that the plaintiff had impliedly agreed to the exclusion of sleep time from his "tour of duty" and was not entitled to treat such time as compensable "work time." Such conclusion accords, as we have said, with the rule as enumerated in at least six circuit courts of appeals dealing with cases arising under the Act and as followed generally in cases governing contractual relationships between employer and employee.

We affirm the decision of the district court.

AFFIRMED.